**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jul 16 2014, 9:23 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**J. BRAD VOELZ**
Warsaw, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**RICHARD C. WEBSTER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ASHLEY N. LEMON, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 92A03-1310-CR-419 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

### APPEAL FROM WHITLEY CIRCUIT COURT
The Honorable James R. Heuer, Judge
Cause No. 92C01-1304-FB-49

**July 16, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Ashley N. Lemon appeals her conviction for Class B felony burglary[1] and Class D felony theft,[2] asserting that the evidence presented at the bench trial was insufficient to convict her.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Lemon and Tara Omelian ("Tara") were childhood friends in Columbia City, Indiana; they went to school together, "hung out all the time together," went to camp together, and Lemon "stayed summers" at Tara's house. *Appellant's Br*. at 6; *Tr*. at 117. They were "like sisters." *Tr*. at 117. After high school, Lemon moved away from Columbia City, and they saw less of each other. However, some years later, when Lemon and her boyfriend, Jeffrey Sanford ("Sanford"), separated, Lemon moved back to Columbia City to live with her mother, and it was then that Lemon and Tara began to spend time together again. For about a three-month time period at the end of 2012 and early 2013, they saw each other almost every day. One day, in October 2012, Lemon and Tara went to the home of Tara's mother, Linda King ("King"). King still lived in the same residence on Douglas Street where Lemon and Tara had spent so much time together as friends throughout the years.

The morning of February 12, 2013, King left her home and drove to Hall's Restaurant ("Hall's"), where she was a waitress. Her shift started at 11:00 a.m. In fact, King had worked the same 11:00 a.m. to 5:00 p.m. shift, Monday through Friday, at Hall's

---

[1] *See* Ind. Code § 35-43-2-1.

[2] *See* Ind. Code § 35-43-4-2.

2

for thirty years. When King returned home around 6:30 p.m. that day, she entered the house through the carport door and into the kitchen. She went directly to the bathroom, not noticing anything out of the ordinary. However, when she returned to the kitchen, she noticed a small screw on the floor near the door, which had been installed a year and a half prior. She opened the door and discovered that the striker plate was missing and the wooden door casing was splintered, with approximately two feet of the casing missing. She looked outside but found no debris.

King's twenty-one-year-old son, Michael King ("Michael"), lived with her and worked at Walmart, located about ten minutes away. Michael could not receive phone calls at work, so King drove to Walmart to check on him, make sure he was alright, and see if he knew anything about the broken door. He did not, so she returned home and called the police. In the meantime, she checked a certain decorative jug or jar where, for years, she had kept loose change and her tip money that she earned as a waitress. She always kept the jug on top of a wooden hutch in her kitchen. When she left for work that day the jug was full, but when she checked it, she found that it was empty.

Columbia City Police Officer Jeffrey Chapman responded to the dispatch call regarding the burglary, arriving at King's house around 8:00 p.m. Michael had arrived home by then, and he discovered a mason jar that he kept in his room for loose change was also gone. King suspected perhaps family members who were "down on [their] luck" may have taken the money, so she asked Officer Chapman not to investigate and indicated she would handle the matter herself. *Id*. at 40-41. King had in mind two specific relatives that

3

might have some involvement: One of them she reached by phone that evening, and he denied involvement; the other she was unable to contact.

The following day, Michael asked neighbors if they had seen or noticed anything happening around King's house the prior day. Adam Mohler ("Mohler"), who lived across the street said that he had heard a loud car at 4:00 or 4:15 p.m., and he looked out his window to check if it was in his driveway. He saw a rusty, dark red vehicle not in his own driveway, but in King's.[3] Mohler saw Lemon, who he recognized as Tara's friend, knocking on King's front door, and he saw another adult waiting in the vehicle's driver's seat. Assuming that Lemon was visiting Tara at King's house, Mohler returned to his chair to watch television. However, Mohler heard the car return about five to fifteen minutes later. He looked out again, and this time, the car was parked under King's carport. Mohler did not observe any persons either in or out of the car on this second occasion. He did not observe or suspect any criminal activity.

King, in turn, gave this information to the Columbia City Police Department on February 13, 2013, and told them to proceed with an investigation. Detective Sergeant Robert Stephenson contacted Lemon on February 26, 2013, at her residence where she was living with Sanford. Because it was an inconvenient time for Lemon, she and Detective Stephenson agreed to meet on March 6, 2013. Lemon came to the police station as arranged, and Detective Stephenson told Lemon that King's house had been burglarized on February 12, and Lemon responded that she had not been there "in quite some time."

---

[3] Mohler believed the vehicle he saw at King's was a 1980s Chevy Celebrity.

4

*Id*. at 90.  Detective Stephenson then advised Lemon that a witness had observed her at King's residence that day.  Lemon's initial response was to deny having been there, and then she became visibly shaken, lips quivering and body shaking.  After a few moments, Lemon explained to Detective Stephenson that as she was returning from Fort Wayne, she had an immediate need to urinate, so she stopped at King's house and urinated on the driveway under the carport.  Lemon said that she was driving and that she had her child with her.  Lemon said she was "so embarrassed" about it, but she felt she had no choice but to urinate outside on the driveway.  *Id.*  Detective Stephenson inquired why she did not go to a nearby gas station or other available public restrooms, located a few blocks away, and Lemon's response was that she did not think she could make it any farther without urinating in the car.  At this point in the interview, Lemon was "crying . . . almost uncontrollably," so Detective Stephenson terminated the interview, and gave her a form to complete a written statement.  *Id*. at 92.  She returned the written statement on March 20, 2013, which again stated that she had stopped at King's to urinate.  She said in her statement that she stopped at King's for, at most, three minutes while she quickly urinated in front of her car, on the driveway, under the carport.  Lemon stated that her three-year-old child was in the car alone, in the back seat, and they had to hurry home to meet Sanford after work.  *State's Ex.* 29.

The State charged Lemon with Class B felony burglary and Class D felony theft.  At the bench trial, King testified that Lemon knew about the change jug where she had consistently and continuously kept her loose tip change over the years – same jar, same location.  King explained that Tara and Lemon used to borrow from the jar with permission

5

to get candy and pop during the summer while King was at work at Hall's. King testified that the jug was full when she left for work on February 12, 2013.[4] Tara also testified that Lemon knew about the change jar, and she also testified that Lemon was struggling financially during the time that she and Lemon were spending time together at the end of 2012 and early 2013.

Detective Stephenson testified that Officer Chapman, who first responded to the scene, ran a Bureau of Motor Vehicles inquiry on Sanford, which reflected that a 1991 maroon Buick was registered under his name. Lemon had told Detective Stephenson during her March 6 conversation with him that she was driving the 1991 maroon Buick when she stopped at King's house on February 12 to urinate. *Tr.* at 114. Tara also testified that Lemon and Sanford possessed and drove a maroon Buick.

The trial court took the matter under advisement, and shortly thereafter issued its ruling that found Lemon guilty of both Class B felony burglary and Class D felony theft. At the sentencing hearing, the trial court discussed its ruling, explaining that, although there was no evidence that Lemon was the person who entered the residence, the State proved that she aided and abetted another in the crime of burglary. The trial court stated, "Based on her conduct immediately prior to the commission of the crime, that it was . . . obviously, it was her intent to assist another in . . . in, uh, completing that activity." *Id.* at 128. The trial court merged the theft conviction into the burglary conviction and sentenced her to ten

_____

[4] After King discovered the money was missing, she partly filled the jar up and then counted the money, to estimate how much may have been taken. Finding that the jar held $150.00 when it was about one-third full, King's victim's impact statement reflected that about $400.00 total was taken from her jar.

6

years at the Whitley County Jail, with six years executed[5] and four years of supervised probation. Lemon now appeals.

## DISCUSSION AND DECISION

Lemon contends that there was insufficient evidence to convict her of burglary and theft. When reviewing the sufficiency of the evidence to support a conviction, we consider only the probative evidence and reasonable inferences supporting the verdict. *Oster v. State*, 992 N.E.2d 871, 875 (Ind. Ct. App. 2013), *trans. denied*. It is the factfinder's role to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. *Id.* We consider conflicting evidence in the light most favorable to the trial court's ruling. *Id.* We affirm the conviction unless no reasonable factfinder could find that the elements of the crime were proven beyond a reasonable doubt. *Id.*

In order to convict Lemon of Class B felony burglary, the State was required to prove beyond a reasonable doubt that Lemon did knowingly break and enter into King's dwelling with intent to commit a felony therein. Ind. Code § 35-43-2-1. A burglar's intent to commit a specific felony at the time of the breaking and entering may be inferred from the circumstances. *Oster*, 992 N.E.2d at 876. Evidence of intent need not be insurmountable, but there must be a "'specific fact that provides a solid basis to support a reasonable inference that the defendant had the specific intent to commit a felony[.]"' *Id*. (quoting *Freshwater v. State*, 853 N.E.2d 941, 944 (Ind. 2006)). In this case, the State

---

[5] The trial court split the six years, with four years at the Whitley County Jail and the other two on home detention. The trial court allowed Lemon to "commence serving her Home Detention sentence initially" and then upon completion of the appeal process, "[S]he'll be remanded to the custody of the Sherriff to serve the remaining portion of her sentence[.]" *Tr.* at 128.

7

alleged that Lemon intended to commit the felony of theft, which is governed by Indiana Code section 35-43-4-2(a) and provides that "[a] person who knowingly or intentionally exerts unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use, commits theft, a Class D felony." Thus, the State was required to prove beyond a reasonable doubt that Lemon knowingly or intentionally exerted unauthorized control over the property and currency in King's house, with intent to deprive her of any part of its value or use. Here, the trial court determined that, although it was not clearly proven that Lemon was the individual who entered King's residence, the evidence was sufficient to establish that she assisted another with the burglary and theft.[6] *Tr*. at 128.

As Lemon acknowledges, a conviction for burglary may be sustained by circumstantial evidence alone. *Klaff v. State*, 884 N.E.2d 272, 275 (Ind. Ct. App. 2008). Lemon argues that the "entirely circumstantial" evidence presented at trial failed to prove she committed burglary and theft. *Appellant's Br*. at 12. "'Where circumstantial evidence is used to establish guilt, the question for the reviewing court is whether reasonable minds could reach the inferences drawn by the [factfinder]; if so, there is sufficient evidence.'" *Klaff*, 884 N.E.2d at 274-75 (quoting *Maxwell v. State,* 731 N.E.2d 459, 462 (Ind. Ct. App. 2000), *trans. denied*). We need not determine whether the circumstantial evidence is adequate to overcome every reasonable hypothesis of innocence; rather, we determine

---

[6] "[A]n accomplice is criminally responsible for all acts committed by a confederate that are the natural and probable consequence of their concerted action." *Alvies v. State*, 905 N.E.2d 57, 61 (Ind. Ct. App. 2009); Ind. Code § 35-41-2-4 (a person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense).

whether inferences may be reasonably drawn from that evidence that support the verdict beyond a reasonable doubt. *Id*. at 275. While mere presence at the crime scene with the opportunity to commit a crime is not a sufficient basis on which to support a conviction, presence at the scene in connection with other circumstances tending to show participation, such as companionship with the one engaged in the crime, and the course of conduct of the defendant before, during, and after the offense, may raise a reasonable inference of guilt. *Brink v. State*, 837 N.E.2d 192, 194 (Ind. Ct. App. 2005), *trans. denied*.

Here, on February 13, 2013, Mohler told Michael that he saw a dark red or maroon vehicle in King's driveway on February 12 around 4:00 p.m., which was shortly after Michael had left for work at Walmart. Mohler watched Lemon knocking on King's front door, and he saw an adult sitting in the driver's seat. Mohler heard the same vehicle return approximately five to fifteen minutes later and saw it parked in King's covered carport area. When Detective Stephenson met with Lemon and told her he was investigating a burglary at King's residence that occurred on February 12, Lemon said she had not been to King's house in quite some time. When Detective Stephenson advised Lemon that a witness had seen her there, Lemon initially denied having been there, then became visibly upset and shaky and told him she stopped there briefly to urinate. She told him that her three-year-old child was with her and that the child waited in the back seat of the car. When asked why she did not use the public restrooms that are a few blocks away, she by then was crying uncontrollably, stating that she did not think she could make it there without urinating in the car. Because of her upset condition, Detective Stephenson terminated their meeting. Lemon thereafter sent him a written statement that repeated her version of events,

which was inconsistent with Mohler's in at least a couple of respects. First, she told Detective Stephenson that she was driving and only her child was with her, whereas Mohler had seen an adult in the driver's seat when he observed Lemon knocking at the door. Second, Lemon's version of events did not explain, or even mention, that she was at King's house twice in a fifteen-minute period.

The testimony presented at trial established that King had always placed her same change jug in the same spot on the same hutch in the same kitchen for decades, dating back to Lemon's childhood when she spent so much time at King's home, and the jar still was there when Lemon last visited King's house in October 2012. King testified that Lemon knew about the jar and its contents because Lemon and Tara would, with permission, use money from the change jug to buy treats and ice cream during the summer. Tara likewise testified about the unchanged location of the jar and Lemon's knowledge of it. Tara also testified that, during those months in late 2012 and early 2013 when she and Lemon were most recently spending time together, Lemon was struggling financially.

Lemon suggests that she was so visibly upset during the interview with Detective Stephenson at least in part because she was embarrassed about having to explain her dire need to urinate, but the trial court did not have to believe this explanation for her anxiety or her version of events. It is the function of the trier of fact to determine the weight of the evidence and the credibility of the witnesses and as a result, the factfinder is free to believe whomever it chooses. *Klaff*, 884 N.E.2d at 274 (quotations omitted).

It is undisputed that the tip jug money and Michael's mason jar containing coins were taken from King's residence sometime between the hours of approximately 3:40 p.m.

10

and 6:30 p.m., and, we note, the intruder carefully cleaned up any debris from the broken door, leaving only a small screw on the floor. Lemon was seen knocking at the front door during that two-hour time frame, and the maroon Buick she admits to driving that day was seen twice at King's home within a fifteen-minute time span. However, Lemon's presence at the home on the date in question was not the only evidence. This, combined with other circumstantial evidence before, during, and after the offense – including her knowledge of King's daily work schedule and the location and contents of the money jug, her initial denial of being at the residence, her conduct during the interview with Detective Stephenson, as well as her subsequent answers and explanation for being there, which were not consistent with a witness's observations – was sufficient to raise a reasonable inference of guilt. The trial court acknowledged that this "wasn't an easy decision," and we agree that the evidence was not overwhelming. *Tr.* at 127. However, we are mindful that our task is to "assess only whether the verdict *could* be reached based on reasonable inference that may be drawn from the evidence presented." *Baker v. State*, 968 N.E.2d 227, 229 (Ind. 2012) (emphasis in original). We find that the evidence in this case was sufficient to support the trial court's inference that Lemon burglarized King's residence and intended to commit theft therein.

Affirmed.

BAILEY, J., and MAY, J., concur.